FILED
United States Court of Appeals
Tenth Circuit

April 28, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

SUSAN K. TURNER,

        Plaintiff-Appellant,

    v.

PUBLIC SERVICE COMPANY OF
COLORADO, doing business as Xcel
Energy Inc.,

        Defendant-Appellee.

No. 07-1396

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 05-cv-2100-REB-KLM)**

---

James A. Carleo, Pueblo, Colorado, for Appellant.

Meghan W. Martinez (Richard P. Barkley with her on the brief), Brownstein
Hyatt Farber Schreck, LLP, Denver, Colorado, for Appellee.

---

Before **HARTZ**, **SEYMOUR**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

This case requires us to review the testing and interview procedures for new

hires at a power plant in Pueblo, Colorado. Susan Turner alleges that Public

Service Company of Colorado (PSCo) discriminated against her because of her sex

in violation of Title VII of the Civil Rights Act of 1964 when it refused to hire her for an entry-level position at its Comanche Power Plant. The district court granted summary judgment for PSCo, finding that although Turner presented a prima facie case of sex discrimination, PSCo showed that its testing and interview procedures were not a pretext for unlawful discrimination.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. Background

The background facts in this case span several years.

Susan Turner applied for a "Plant Specialist C" position at PSCo's Comanche Power Plant three times, in 2000, 2004, and 2006. Though PSCo declined to hire Turner for the Plant Specialist C position each time she applied, only Turner's 2004 application is at issue in this appeal.[1] Dave Edmisson, the Manager of Operations at Comanche, had been in charge of hiring since 1997 and was in charge of PSCo's hiring for the vacant Plant Specialist C positions in 2004.

The Plant Specialist C position is an entry-level job requiring little experience. Though a candidate who had previously worked in a power plant would have an edge over others with no power plant experience, Edmisson

---

[1] Turner does not base her present claim on PSCo's decision not to hire her in 2000 or 2006. Additionally, the record does not disclose whether she exhausted her administrative remedies with respect to those vacancies. *See, e.g., Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003) (a Title VII plaintiff must exhaust administrative remedies for each individual discriminatory or retaliatory act).

generally preferred inexperienced workers for the position so he could teach them specific skills relevant to operating the Comanche power plant. Thus, an applicant's behavioral traits—e.g., the applicant's willingness to work with others, motivation to learn new skills, and adaptability—were the chief considerations in the hiring decision.

To evaluate applicants for the Plant Specialist C positions, PSCo used a three-step process. First, it administered a standardized written test to measure applicants' mechanical aptitude. The test, called the POSS/MASS test, was developed by the Edison Electric Institute and is used by numerous industrial companies across the country as a screening mechanism for job applicants. Applicants interested in the Plant Specialist C position could register for the test at PSCo's website and take the test at a location in Denver. PSCo maintained a list of applicants who received passing scores, but neither the applicant nor the hiring personnel at PSCo were notified of the applicant's actual score.

Applicants who passed the POSS/MASS test moved to the second stage of the hiring process, where PSCo screened the remaining applicants' resumes. At this stage, the company was searching for predetermined criteria such as relevant work experience and skills pertinent to the Plant Specialist C position. PSCo awarded points to applicants if their resumes satisfied the predetermined criteria, and the applicants with the most points moved to the third stage of the hiring process—a job interview with a panel of four PSCo employees.

During the job interviews, the interview panel asked each applicant an identical set of pre-selected questions. The questions were derived from a human resources document called the Interview Guide, and were designed to elicit information from the interviewees pertinent to particular qualities, or "competencies," appropriate for the vacancy. The competencies relevant to the Plant Specialist C position included initiative and risk taking, adaptability and dealing with ambiguity, and team building. Each interviewer on the panel took notes of the applicants' responses to these standardized questions and assigned numerical ratings to the applicants for each competency. The numerical ratings were based upon the "behaviors" the applicants demonstrated through their responses to the interview questions and whether those behaviors were "less effective" or "highly effective" according to the Interview Guide.

For example, for the initiative and risk taking competency, the Interview Guide states that an applicant exhibits a "less effective behavior" if his or her answer to an interview question suggests the applicant "acts only after being prompted." Aplt. App. Vol. I at 133. In contrast, the applicant exhibits a "highly effective behavior" if the applicant's answer suggests he or she "knows when to act alone and when to ask for help." *Id.* After each interview, the interviewers discussed and debated the numerical ratings they assigned to the applicant. The interviewers then decided upon consensus scores for each of the applicant's competencies. These consensus scores were tallied to arrive at an applicant's

-4-

"overall rating," which determined whether or not Edmisson offered the applicant a job.

For the six vacant Plant Specialist C positions in 2004, twenty-six candidates passed the POSS/MASS test. The company then narrowed the field to seventeen interviewees based on their resumes. Fifteen interviewees were male and two—Turner and another applicant—were female.

Turner performed poorly during her interview. She received an overall rating of 48.5, the second-lowest of any interviewee, and later testified that she "felt like [she] struggled during the entire thing." Aplt. App. Vol. II at 203 (Turner Dep. Tr. 49:4–7). The other woman applicant, however, performed well in the interview and received a score of 63.5, the second-highest overall rating.

With one exception—a candidate who displayed a fear of heights during a tour of the upper reaches of the plant—Edmisson extended offers to the six highest-scoring candidates. Edmisson later testified that his practice was to hire the "most qualified" candidate, based upon his or her performance during the job interview. Aplt. App. Vol. II at 185 (Edmisson Dep. Tr. at 83:20–84:4). He did not offer Turner a job. He did, however, offer the other woman applicant a position, but she decided not to accept it for personal reasons. The other five applicants accepted PSCo's offer, and Edmisson offered the remaining position to the applicant with the next-highest overall interview rating.

After being rejected for the Plant Specialist C position in 2004, Turner filed a Charge of Discrimination with the Equal Employment Opportunity Commission. She received a right to sue letter from the Commission and subsequently filed this action. In 2006, while her suit against PSCo was pending, she again applied for a job at Comanche, and was again rejected. PSCo moved for summary judgment, arguing it refused to hire Turner because she performed poorly during her job interview and Turner failed to offer any evidence that PSCo's hiring practices were mere pretext for sex discrimination. The district court granted judgment for PSCo and this appeal followed.[2]

## II. Analysis

We review de novo the district court's decision to grant summary judgment in favor of PSCo. *See Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007). We view the facts in a light most favorable to Turner, the non-movant, and draw all reasonable inferences in her favor. *See Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006). But Turner "must still identify sufficient evidence requiring submission to the jury." *Piercy*, 480 F.3d at 1197. She cannot avoid summary judgment merely by presenting a scintilla of evidence to support her

_____

[2] Carolyn Davis, a PSCo employee, was originally a co-plaintiff in this case. Davis claimed that PSCo refused to promote her because of her sex. The district court entered summary judgment against Davis, finding that she failed to establish a prima facie case of sex discrimination and failed to present evidence showing PSCo's legitimate reason for refusing to promote her was pretextual. Though Davis appealed the district court's judgment, she subsequently settled with PSCo and is no longer a party to this case.

claim; she must proffer facts such that a reasonable jury could find in her favor. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

Turner has not pointed to direct evidence of sex discrimination. We thus view her claim through the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *See Garrison*, 428 F.3d at 937. Under this framework, Turner has the burden of initially establishing a prima facie case of sex discrimination, namely that (1) she is a member of a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the Plant Specialist C position, and (4) she was treated less favorably than others not in the protected class. *See Piercy*, 480 F.3d at 1203 (citing *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 531 (10th Cir. 1998)). The district court below found that Turner established a prima facie case, and PSCo does not dispute this finding.

With the prima facie requirements met, the burden shifts to PSCo "to articulate some legitimate, nondiscriminatory reason" for its decision not to hire Turner. *See McDonnell Douglas*, 411 U.S. at 802; *see also Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007). If it does so, Turner "then has the full burden to show that the employer discriminated on the basis of sex." *Timmerman*, 483 F.3d at 1113. She may carry this burden by showing that PSCo's legitimate, nondiscriminatory reason for failing to hire her was merely pretextual. *See id.* A claim of pretext need not be supported with direct evidence, but may be based on "'weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions' in the employer's claimed legitimate, non-discriminatory reason such that a rational trier of fact could find the reason unworthy of belief." *Id.* (quoting *Morgan v. Hilti Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

Turner makes three arguments on appeal. First, she claims PSCo failed to offer sufficient evidence that it had legitimate reasons for refusing to extend her an offer and therefore failed to rebut her prima facie case of sex discrimination. Next, she claims sufficient disputed facts support her argument that PSCo's proffered reason for refusing to hire her—her poor interview performance—was pretextual. Finally, she claims PSCo destroyed or withheld from discovery incriminating notes from the job interviews and did so in bad faith, thus entitling her to an inference of discrimination.

We find none of these arguments persuasive.

### A.      *Rebuttal of Prima Facie Case*

The district court found that PSCo provided a legitimate, nondiscriminatory reason for refusing to hire Turner:  she performed poorly on the job interview compared to other candidates for the Plant Specialist C position.  But Turner now claims the record does not support the district court's determination.

Turner raises this argument for the first time on appeal.  Absent extraordinary circumstances, we will not consider arguments raised for the first time on appeal. *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 999 (10th Cir. 2002).  Turner "may not lose in the district court on one theory of the case, and

-8-

then prevail on appeal on a different theory," even if the new theory "falls under the same general category as an argument presented at trial." *Id.* (internal quotation marks omitted) (quoting *Lyons v. Jefferson Bank & Trust*, 994 F.2d 716, 721–22 (10th Cir. 1993)).

But even if Turner had preserved her argument for appeal, it is clear from the record the argument fails. PSCo was not required to *prove* that it refused to hire Turner based on her interview performance; it was only required to put forth enough evidence to carry its burden of production and rebut Turner's prima facie case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–11 (1993); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981). PSCo more than satisfied this burden. It produced score sheets showing that Turner ranked second-to-last among the interviewees. These same documents revealed that only the top interviewees received job offers. Finally, Edmisson—the principal decision maker—testified that his decision not to hire Turner was based on her poor job interview. This evidence "frame[d] the factual issue with sufficient clarity" such that Turner had "a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56. Therefore, PSCo carried its burden of production and rebutted Turner's prima facie case.

## B. *Pretext*

We now turn to the question of pretext. Because PSCo has provided a legitimate, nondiscriminatory reason for refusing to hire Turner, the burden shifts

back to Turner to show sufficient disputed facts that PSCo's reason was merely a pretext for sex discrimination. *See Timmerman*, 483 F.3d at 1112–13. If Turner cannot meet this burden, we must affirm summary judgment in favor of PSCo. *See Piercy*, 480 F.3d at 1200.

Our task, therefore, is to examine whether Turner's characterization of the evidence would persuade a reasonable jury that PSCo used its hiring process to disguise sex discrimination. *See Young*, 468 F.3d at 1249–50; *see also Rivera v. City and County of Denver*, 365 F.3d 912, 925 (10th Cir. 2004). But in conducting this analysis, we cannot act as a "super personnel department" or second-guess PSCo's good-faith business judgments. *Young*, 468 F.3d at 1250 (quoting *Jones v. Barnhart*, 349 F.3d 1260, 1267 (10th Cir. 2004)).

Turner attacks PSCo's hiring process in three ways. *First*, she claims PSCo has a history of sex discrimination, and points to a sexual harassment lawsuit it lost in the 1980s to show PSCo's general bias against women in 2004. *Second*, she claims the 2004 interview process was excessively subjective and was designed to exclude women from positions at the plant. *Third*, she argues that various statistics regarding PSCo's workforce and hiring practices create the inference she was not hired because of her sex.

### 1. Prior Litigation Against PSCo

Turner's first argument is easily disposed of on staleness grounds.

In 1991, PSCo lost a sexual harassment lawsuit involving conduct at the Comanche Plant from 1980 to 1988. *Hansel v. Pub. Serv. Co. of Colo.*, 778 F. Supp. 1126, 1133–34 (D. Colo. 1991). This lawsuit, Turner claims, proves PSCo discriminated against her.

In some instances, evidence that an employer's decision makers harbored a general bias against a protected class may support an inference that the decision makers were influenced by the bias in making a particular employment decision. *See Ortiz v. Norton*, 254 F.3d 889, 896 (10th Cir. 2001). "This does not mean, however, that evidence as to the prior mistreatment of employees in a protected class necessarily gives rise to an inference that all subsequent employment decisions adversely affecting that protected class or someone in it, no matter how unrelated, are also tainted with bias." *Timmerman*, 483 F.3d at 1117. For evidence of general bias to be pertinent, we require some connection or logical "nexus" between a showing of general bias and a particular employment decision. *Id*. at 1117–18. The general bias must play "a *direct role* in the adverse employment decision in the plaintiff's case." *Id.* at 1118 (emphasis added).

Turner relies on *Hansel*'s finding of a hostile work environment for conduct that ended in 1988 to show that PSCo harbored a general bias against women when it refused to hire her in 2004. Here, the required nexus obviously does not exist. First, the hostile work environment in *Hansel* is not proximate in time to the discrimination alleged in this case. In some instances, numerous adverse

-11-

employment actions involving other protected employees, each occurring within a year of the adverse employment action at issue, may suggest the decision maker was motivated by the same general discriminatory bias. *See Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 560–61 (10th Cir. 1996). But we have clarified that a gap of two years between the alleged general bias and the adverse employment action signals a lack of "temporal proximity." *Timmerman*, 483 F.3d at 1115 n.3. In Turner's case, the gap was over fifteen years, certainly long enough to be outside the range of "temporal proximity."

Moreover, *Hansel* involved different individuals engaging in different conduct. Because the focus of a pretext analysis under Title VII is on the decision maker, *see Piercy*, 480 F.3d at 1200, the nexus between an alleged general bias and a particular employment decision made years later becomes even more tenuous when the bias existed before the relevant decision maker was in a position to make employment decisions. Here, Edmisson was not a manager at Comanche when the conduct in *Hansel* occurred, and *Hansel* involved a different form of discrimination—the plaintiff alleged a hostile work environment, not an adverse employment action—from the discrimination alleged in this case.

In sum, the existence of prior litigation for sex harassment in the 1980s is in this case insufficient to warrant an inference of sex discrimination in hiring in 2004.

### 2. *Subjectivity of Interviews*

Turner's next argument is that PSCo's interview process was a sham meant to hide its discriminatory hiring practices. She characterizes the interview questions as "purely subjective" and "lacking any relationship to actual job tasks or skills." Aplt. Br. at 9. She also notes that no female interviewers sat on her interview panel. Turner, however, fails to explain exactly how the interview questions disadvantaged women over men, and, more importantly, ignores the fact that the other female candidate for the Plant Specialist C position in 2004 was rated second-best among all 2004 interviewees and was offered a job.

Although "the presence of subjective decision-making can create a strong inference of discrimination," the use of subjective considerations by employers is "not unlawful per se." *Bauer v. Bailar*, 647 F.2d 1037, 1045–1046 (10th Cir. 1981). Rather, "we have consistently recognized that such criteria 'must play some role' in certain management decisions and accordingly have reviewed the use of subjective factors on a case-by-case basis." *Green v. New Mexico*, 420 F.3d 1189, 1195 (10th Cir. 2005) (quoting *Pitre v. W. Elec. Co.*, 843 F.2d 1262, 1272 (10th Cir. 1988)). Though "there is certainly a level of subjectivity in *any* interview-based selection process," interviewers do not always "use[] their discretion as a means for unlawful discrimination." *Santana v. City and County of Denver*, 488 F.3d 860, 866 (10th Cir. 2007) (emphasis added). We thus "typically infer pretext . . . only when the criteria on which the employers ultimately rely are *entirely subjective* in nature." *Jones*, 349 F.3d at 1267–68 (emphasis added).

-13-

Here, the criteria PSCo used to rate interviewees were not excessively subjective for several reasons. First, each applicant answered the same questions, and the interviewers ranked the applicants' responses using predetermined criteria from PSCo's Interview Guide. *See Santana*, 488 F.3d at 866 (finding that though the interview process at issue was subjective, it was not discriminatory in part because "[t]he panelists asked every applicant the same three questions and then ranked the candidates based on their responses"); *see also Bauer*, 647 F.2d at 1043 ("the standards from which the selection committee made a choice were written down and in that sense were objective").

Second, the questions inquired into job-related areas, or "competencies," such as the interviewee's technical orientation, team building skills, communication skills, and willingness to learn. These competencies were mandatory considerations for PSCo's interviewers. The interviewers thus were not given discretion to determine the scope of the interviews, and Turner points to no evidence suggesting the interviewers injected their own additional subjective criteria into the evaluation process. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1121 (10th Cir. 2007) (in determining the subjectivity of an employee investigation, the "important question" is whether the plaintiff's supervisor had "unfettered discretion"). In this light, the competencies cannot be considered wholly subjective, as Turner contends, merely because they cannot be precisely quantified. *See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1195

-14-

(10th Cir. 2006) (because the employer used an evaluation form that "included multiple mandatory areas for evaluation," the evaluation process was not "wholly subjective" even though these evaluation areas related to "soft skills").

Third, even to the extent the questions did not elicit measurable data, the interview process required the interviewees to think on their feet and thereby supply insight as to adaptability and trainability. *Cf. id*. (though an evaluation process included "such subjective considerations as team building, personal leadership, and personal accountability," the process was not "wholly subjective"). PSCo sought to mold new hires into effective Plant Specialist C workers, and believed the preselected competencies were important indicators of a candidate's likelihood of succeeding in the position. Thus, the interview questions and the candidates' agility in responding to identical inquiries were relevant to the candidates' qualifications; the evaluations made by the interview panels were not based on whims or unguided opinions.

Nor does the fact that Turner's interview panel consisted of four men raise any concerns. Turner proffered no evidence that any of the interviewers held discriminatory attitudes or participated in past discrimination. *Cf. Pitre*, 843 F.2d at 1272. Furthermore, Turner admitted in deposition testimony that she performed poorly during the interview. She said, for example, she "was definitely befuddled" and "felt like [she] struggled during the entire thing." Aplt. App. Vol. II at 202–203 (Turner Dep. Tr. 47:22, 49:4–7). These admissions confirm the

interviewers' assessments—which placed Turner second-to-last among all the interviewees—and undermine Turner's claim her male interviewers' evaluations were based on her sex rather than her interview performance. *See Santana*, 488 F.3d at 866 ("The interviewers thought, and Santana agreed, that she did not present herself as a strong candidate . . . ."). The only other woman applicant, of course, performed well in the interviews and received a job offer.

Thus, considering the record as a whole, no reasonable jury could agree with Turner's assertion that the interview "serve[d] only as a device to exclude women," Aplt. Br. at 24, or that PSCo's interview process was "wholly subjective" and therefore pretextual. *Cf. Pippin*, 440 F.3d at 1195 (analyzing an employee evaluation process and concluding that it was not "wholly subjective").

### 3. *Statistics*

Finally, Turner points to a hodgepodge of plant employment statistics to support an inference of pretext. First, she states that only one of 115 workers in "non-traditional" positions at Comanche is a woman.[3] Second, she notes that from 1992 to 2005, no women were hired for entry-level positions at Comanche but twenty men were. Finally, she asserts that though she applied for a job at the Comanche Power Plant on three separate occasions and was "qualified" for the job,

---

[3] Turner defines a "non-traditional" position as one involving "production" rather than clerical or professional duties. Aplt. Br. at 4 n.1.

-16-

she was rejected each time.[4] Turner argues these statistics prove that PSCo's reason for refusing to hire her was pretextual.

We have long required that "[s]tatistical evidence should be closely related to the issues in the case. . . . Even statistics which show prolonged and marked imbalance may not be controlling in an individual discrimination case where a legitimate reason for the employer's action is present." *Bauer*, 647 F.2d at 1045. Thus, the "real question is whether the [employment actions at issue], *and those* [*actions*] *alone*, involved discrimination on the basis of sex." *Id*. (emphasis added). "[I]n order for statistical evidence to create an inference of discrimination, the statistics must show a significant disparity and eliminate nondiscriminatory explanations for the disparity. In other words, a plaintiff's statistical evidence must focus on eliminating nondiscriminatory explanations for the disparate treatment by showing disparate treatment between *comparable* individuals." *Fallis v. Kerr-McGee Corp.*, 944 F.2d 743, 746 (10th Cir. 1991) (citation omitted) (emphasis in original); *see also Pippin*, 440 F.3d at 1197–98.

Each category of statistical evidence Turner cites fails to create a genuine issue of material fact. First, Turner's statistic regarding the gender imbalance of the "non-traditional" workforce at Comanche does not, without additional

---

[4] Evidence of past and subsequent adverse employment actions may be introduced to provide "background" for the adverse employment action at issue in a Title VII case though the past and subsequent actions are not the basis of the claim before the court. *See Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).

evidence, suggest that Turner herself experienced discrimination. The numbers fail to provide any information regarding whether the decision not to hire Turner, and that decision alone, "involved discrimination on the basis of sex." *Bauer*, 647 F.2d at 1045. Without evidence regarding the number of male and female applicants, interviewees, and the like, the employment statistic is nearly meaningless. *See Sanders v. Sw. Bell Tel., LP*, 544 F.3d 1101, 1110 (10th Cir. 2008) ("Because the statistics fail to account for [numerous relevant] variables, they do not constitute evidence of pretext."); *Timmerman*, 483 F.3d at 1126 (Lucero, J., concurring) ("[T]he statistics in this case ultimately provide little material support to Timmerman's claim . . . . [M]ale applicants significantly outnumbered female applicants . . . ."); *see also LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 848 (1st Cir. 1993) ("[A] company's overall employment statistics will, in at least many cases, have little direct bearing on the specific intentions of the employer when dismissing a particular individual.").

Second, Turner once again fails to account for the fact that another woman participated in the same 2004 application process as Turner, performed second-best among seventeen interviewees, and received a job offer. Indeed, neither Turner's initial brief nor her reply brief even mentions this important fact; she instead incorrectly states in her initial brief that PSCo made "zero selection [of women] over a 15-year period of time." Aplt. Br. at 25 (emphasis in original). PSCo points out that if the other woman's candidacy is included in the statistics for the 2004

hiring, PSCo's offer rate stood at an entirely reasonable rate of 50 percent for women (one offer out of two candidates). *Cf. Carney v. City and County of Denver*, 534 F.3d 1269, 1275 (10th Cir. 2008) (suggesting that "gross statistical disparities" may show pretext, but refusing to determine whether the statistical disparities at issue were gross because there were numerous problems with the plaintiff's statistical evidence) (internal quotation marks and citation omitted).

Furthermore, though Turner places great emphasis on the fact that PSCo "was unable to hire a single female from 1992 to 2005," Aplt. Br. at 26, she admits that Comanche was subject to a hiring freeze for a large portion of that time period, and no candidates—regardless of their sex—could have been hired then. Also, Turner once again distorts the numbers. She fails to acknowledge that from 1999 to 2005, after the hiring freeze was lifted, the hiring pool included only two women—Turner and one other candidate—and the other woman received a job offer.

And although PSCo again refused to hire Turner in 2006, Turner neglects to mention it hired three women for entry-level positions that year. For Turner's statistics to be probative of discrimination, they must "relate to the proper population," *see Carpenter v. Boeing Co.*, 456 F.3d 1183, 1196 (10th Cir. 2006), and by conspicuously excluding from her data the fact that PSCo hired three women in 2006, Turner undercuts her statistical argument. The numbers may not be derived from a sufficiently large sample to be entirely reliable one way or the

other, but at the very least, it is obvious they fail to show "disparate treatment between *comparable* individuals." *Fallis*, 944 F.2d at 746 (emphasis in original); *see also Carney*, 534 F.3d at 1275–76 (expressing concern for whether "the statistical disparities [the plaintiff] cites are statistically significant," and concluding "the record provides no basis on which a rational fact finder could conclude" the plaintiff had proven her discrimination claim).

Finally, none of Turner's statistics eliminates PSCo's *nondiscriminatory* reason for refusing to hire her. *See Pippin*, 440 F.3d at 1198. She suggests she completed PSCo's hiring process with flying colors in 2000, 2004, and 2006. But the record contradicts this assertion: while she may have satisfied the screening criteria (the POSS/MASS test and PSCo's resume review), she failed the most important portion of the selection process, the interview itself. In 2004, Turner received the second-to-lowest overall interview rating, and like other applicants who performed poorly on the interview, was not offered a job. Because Turner's statistics do not account for her poor interview performance, they are insufficient to create an inference of pretext. *See Fallis*, 944 F.2d at 747 (holding that because a group of workers who were in a protected class received "lower proficiency ratings" than their peers and the plaintiff's statistical evidence did not account for these low ratings, the statistics failed to create an inference of discrimination).

### C. Lost Documents

Turner's last argument concerns missing notes the interviewers took during the 2000 and 2004 hiring sessions, which the interviewers used to assess the applicants' interview performances and assign interview scores. Turner claims that because PSCo allegedly lost or refused to produce the notes, she is entitled to judgment as a matter of law on her Title VII claim. PSCo argues it did not intentionally withhold the interview notes, but that they were apparently lost in transit when they were mailed from the Comanche Power Plant to PSCo's central staffing office in Minneapolis.[5]

During discovery, PSCo produced thousands of pages of documents, including 195 pages related to the 2000 and 2004 hirings. Because the documents did not include the interview notes from the 2000 and 2004 hirings, Turner filed a motion to compel in the district court, seeking an "accounting" of the missing interview notes and arguing that she was "entitled to an adverse instruction." App. Vol. II at 244. The district court referred the motion to a magistrate judge, who issued an order denying the motion because of its overbreadth.

Turner did not appeal the magistrate judge's order to the district judge, nor did she move for sanctions under Federal Rule of Civil Procedure 37 for PSCo's nondisclosure. Instead, she argued in her response brief to PSCo's motion for summary judgment that she was "left without any ability to challenge the interview

---

[5] PSCo sent these documents to Minneapolis before Turner filed her charge of discrimination with the Equal Employment Opportunity Commission.

scoring" because PSCo failed to produce the 2000 and 2004 interview notes. App. Vol. I at 54. PSCo interpreted Turner's argument as a spoliation of evidence claim. If Turner prevailed on this claim, the district court could have imposed various sanctions on PSCo for nondisclosure of the interview notes, including an adverse inference that the lost interview notes would have proved Turner's claim of pretext. *See, e.g., Henning v. Union Pac. R.R. Co.*, 530 F.3d 1206, 1220 (10th Cir. 2008).

PSCo argued in its summary judgment reply brief that Turner failed to provide evidence of bad faith on the part of PSCo and therefore could not prove she was entitled to an adverse inference under her spoliation theory. In its order granting summary judgment for PSCo, the district court noted that Turner failed to "specify what relief she seeks based on PSCo's inability to produce these [interview] notes." App. Vol. I at 80. The court concluded there was no evidence of bad faith on the part of PSCo, and even if PSCo had been negligent with respect to the interview notes, its negligence would not have created a triable issue of fact as to whether the decision not to hire Turner was pretextual.

Turner again presses her spoliation claim on appeal. She argues that PSCo was required under 29 C.F.R. § 1602.14 to retain the interview notes "until final disposition" of Turner's discrimination charge. She further contends that she suffered prejudice because she now lacks evidence to challenge the interviewers' assessments of her interview performance. Finally, she alleges that PSCo acted in bad faith when it failed to produce the interview notes.

Even in cases where employers destroy evidence they are required to retain under 29 C.F.R. § 1602.14, plaintiffs must be "diligent in the defense of their own interests," and should seek sanctions under Federal Rule of Civil Procedure 37 to remedy any prejudice caused by spoliation. *See Mathis v. John Morden Buick, Inc.*, 136 F.3d 1153, 1156 (7th Cir. 1998). When a plaintiff fails to seek sanctions under Rule 37 and thus "forecloses access to the substantial weaponry in the district court's arsenal," the plaintiff's only remaining option is to seek sanctions under a spoliation of evidence theory. *Id.* at 1155; *see also Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997) (applying the spoliation of evidence doctrine in a discrimination case).

Spoliation sanctions are proper when "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007). But if the aggrieved party seeks an adverse inference to remedy the spoliation, it must also prove bad faith. "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Aramburu*, 112 F.3d at 1407. Without a showing of bad faith, a district court may only impose lesser sanctions. *Henning*, 530 F.3d at 1220. We review a district court's finding of bad faith or "mere negligence" for clear error, *id*., and the district

-23-

court's decision to impose or deny spoliation sanctions for abuse of discretion. *Grant*, 505 F.3d at 1032.

The district court did not clearly err in concluding that PSCo lacked bad faith. Considering the record as a whole, we cannot say the district court's finding was without factual support, nor do we have a definite and firm conviction that the district court's finding was a mistake. *See Aquila, Inc. v. C.W. Mining Co.*, 545 F.3d 1258, 1263 (10th Cir. 2008). PSCo provided evidence, in the form of an email from Edmisson to a staff member in Minneapolis, that Edmisson attempted to send the interview notes to Minneapolis before Turner filed her charge of discrimination. Additionally, PSCo produced numerous documents relating to the 2000 and 2004 hiring, including Edmisson's "hiring plan," Turner's 2004 interview score sheet, a document revealing the scores of each candidate interviewed in 2004, and PSCo's Competency-Based Interview Guide. *See Aramburu*, 112 F.3d at 1407 (though the employer lost pertinent employment records, "any inference of bad faith is undermined by the other [] records produced by [the employer]"). Finally, PSCo made Edmisson available for a deposition by Turner's counsel, during which Edmisson answered extensive questions regarding the interview process and his decision not to hire Turner. The record as a whole therefore does not suggest that PSCo acted in bad faith when it lost the 2000 and 2004 interview notes, and Turner was not entitled to an inference that the lost interview notes would have proved her pretext claim. *See id.* (because the record did not support a finding of bad faith, the

plaintiff had "not shown himself entitled to an adverse inference under the spoilation doctrine").

The court moreover did not abuse its discretion when it refused to impose a lesser sanction to remedy PSCo's alleged spoliation. Assuming PSCo had a duty to retain the interview notes under the spoliation doctrine, there is no evidence that Turner was "actually, rather than merely theoretically" prejudiced by their loss. *See Grant*, 505 F.3d at 1032–33. As noted above, Turner had access to a significant amount of evidence regarding the interview process and her performance during the 2004 interview. Turner herself admitted in deposition testimony that she performed poorly during her 2004 interview. Her interview score sheet confirmed this admission, as did Edmisson's deposition testimony. Turner has presented no evidence suggesting that Edmisson or anyone else at PSCo made their decisions based upon a bias against women, and it is unlikely that the sole reason why Turner has been unable to prove her claim is the loss of the interview notes.

## III. Conclusion

For these reasons, we AFFIRM the district court's grant of summary judgment in favor of PSCo.